NOT FOR PUBLICATION                                         (Docket No. 41)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| ANTHONY R. BIAFORE, | : |
| Plaintiff, | : Civil No. 08-5310 (RBK-AMD) |
| v. | : **OPINION** |
| UNITED STATES OF AMERICA, et al., | : |
| Defendants. | : |

**KUGLER**, United States District Judge:

This matter comes before the Court on a motion by Defendants United States of America, Jeff Grondolski, Dr. Chung, Dr. Sulayman, Mrs. Leibel, D. Schaaff, and Dr. Gonzalez ("Defendants") to dismiss the Complaint of Plaintiff Anthony R. Biafore ("Plaintiff"), or in the alternative, for summary judgment. The Complaint brings claims pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971) and the Federal Tort Claims Act, 28 U.S.C. § 1346 ("FTCA").

For the reasons discussed below, Defendants' motion will be granted.

**I.      BACKGROUND**[1]

Plaintiff is currently incarcerated in New Jersey at Federal Correctional Institution Fort

---

[1] Because Plaintiff has not opposed Defendants' motion, the facts articulated in this section are drawn from Plaintiff's Complaint and Defendants' brief in support of its motion.

1

Dix ("Fort Dix").  Shortly after his arrival at Fort Dix, that is, on December 29, 2007, Plaintiff was assigned to a work detail in the dining room, requiring him to lift heavy tables and mop the floors.  Plaintiff informed his supervisor Mr. Puma that he was medically unable to perform his duties due to a history of degenerated disc issues.  Mr. Puma allegedly responded that Plaintiff could do his job or find himself in the Special Housing Unit ("SHU").

Several hours into his work shift on January 2, 2008, Plaintiff attempted to pick up a bucket of dirty mop water and experienced a sudden onset of excruciating pain.  He reported the pain to Mr. Puma and was sent to Health Services, where he was examined by a physician's assistant and sent back to his unit.  The next morning, Plaintiff awoke to discover a football shaped lump in his abdomen region accompanied by blood in his umbilical area.  Plaintiff returned to Health Services where he was evaluated, told that the lump was a normal part of his anatomy, and directed to return to work.

On January 10, 2008, Plaintiff again went to Health Services.  This time he was examined by Defendant Dr. Sulayman, a clinical physician, who told Plaintiff that there was nothing wrong with him and that he should not return until he had a genuine injury.  The following day at work, Plaintiff felt ill and discovered blood leaking through his clothing.  He was released to Health Services where he was examined by the Clinical Director, Defendant Dr. Chung.  Dr. Chung diagnosed Plaintiff with a ventral hernia and indicated that Plaintiff should be placed on the surgical consultant waiting list.  Plaintiff was released back to work with a fifteen-pound lifting restriction.

In the weeks that followed, Plaintiff returned to Health Services numerous times to receive medical care but was not satisfied with the level of care that he received.  Accordingly, he

filed an administrative complaint. On February 19, 2008, Plaintiff saw a surgical consultant who recommended surgery at Saint Francis Hospital in Trenton, New Jersey.

In the meantime, Plaintiff began inquiring into the level of care he could anticipate at Fort Dix after he returned from his surgery. In this pursuit, Plaintiff accompanied a fellow inmate who had recently spent thirty days in the hospital to Health Services to assist him in receiving follow-up care. Observing that his fellow inmate received only the "barest amount" of post-surgical care, Plaintiff asked Physician's Assistant Richardson about Medical Service's protocol for post-surgical care. According to Plaintiff, Richardson instructed him to "refuse the surgery, if you don't like how we work." Plaintiff subsequently signed a surgical refusal form, but allegedly stated: "This is not a refusal. I am worried about my after-care. Under duress." (Compl. at ¶ 26.) As a result, Plaintiff's surgery was cancelled on March 31, 2008.

Plaintiff later changed his mind about the surgery. On August 15, 2008, surgery was performed on Plaintiff at Saint Francis Hospital by Dr. Shah. Upon Plaintiff's return to the hospital, the physician's assistant on duty prematurely removed the strip-tape on the dressing covering the ten inch area of Plaintiff's body where Dr. Shah made a surgical incision. The physician's assistant also informed Plaintiff that Dr. Shah had not prescribed any after-care and that Health Services was not required to change Plaintiff's dressings. In fact, Health Services only cleaned the incision and wound area one time and prescribed Tylenol 3 for pain.

At the dining facility on August 25, 2008, Plaintiff alerted staff that he was bleeding through his shirt. Plaintiff was directed to Health Services where he was required to wait forty-five minutes before a physician's assistant could attend to him. Eventually, Plaintiff was evaluated by a physician's assistant who gave Plaintiff gauze and tape and instructed him to

3

"help himself." (Compl. at ¶ 35.) The following morning, Plaintiff went to Health Services to report the alleged misconduct of the physician's assistant to Dr. Chung and Health Services Administrator Mrs. Leibel. Although Plaintiff's complaint was rejected, medical personnel did administer two stitches to Plaintiff's wound to stop the bleeding.

On September 4, 2008, Plaintiff went to Health Services to have the stitches removed and to report pain. The stitches were removed, but the pain was not addressed. Roughly one week later, on September 10, 2008, Plaintiff discovered fluids leaking from his incision and infected puss being discharged from the umbilical area. Plaintiff reported the infection to Health Services the following day. Staff at Health Services prescribed Plaintiff with antibiotics and Motrin for his pain, which Plaintiff alleges took four days for him to receive. On September 16, 2008, Plaintiff again went to Health Services to report pain and discomfort. Dr. Chung examined Plaintiff and sent him to the hospital. Upon Plaintiff's arrival at the hospital, he was required to sit in the emergency room's waiting room for five to seven hours. Once admitted, Plaintiff was evaluated by Dr. Shah, who ordered a C-SCAN and determined that Plaintiff's wound was infected. The following day, surgery was performed to clean the previous incision. During surgery, a gauze line was inserted to prevent infection and a medical decision was made to leave the wound "open."

Upon Plaintiff's return to Fort Dix, Plaintiff alleges that Health Services was provided with sterilized kits to clean and treat his open wound, but that Health Services staff failed to use them. According to Plaintiff, staff members insisted that they did not know the location of the sterilized kits, even though Plaintiff repeatedly told them where to look. In one case, a physician's assistants charged with reapplying Plaintiff's dressings allegedly failed to even use

4

sterilized gloves to remove gauze from Plaintiff's open wound, instead utilizing his bare thumb and index finger. On September 22, 2008, Plaintiff made an attempt to informally resolve the issues with staff attorney Nicole McFarland. Ms. McFarland was allegedly unwilling to compromise, stating "Bring the matter to Court." (Compl. at ¶ 49.)

The physical pain Plaintiff has experienced at Fort Dix has affected his mental health, causing Plaintiff to request help from Mental Health Services. According to Plaintiff, his attempts to get mental help were met with cynicism, unprofessionalism, and downright cruelty. On May 9, 2008, Defendant Dr. Gonzalez allegedly told Plaintiff that he was prescribing him an anti-depressant medication known as Effexor. According to Plaintiff, Dr. Gonzalez instead gave Plaintiff an anti-psychotic medication known as Haldol for the purpose of slowing Plaintiff's normal functioning. In an attempt to cover-up these actions, Dr. Gonzalez allegedly forged Plaintiff's signature to a consent document. As a result of taking Haldol, Plaintiff has experienced adverse side-effects requiring medication.[2]

On numerous occasions, beginning sometime around July 15, 2008 and continuing to the present, Plaintiff alleges that Defendant D. Schaaff, a guard in Plaintiff's unit, has attempted to intimidate him into refraining from utilizing the prison administrative complaint system. According to Plaintiff, Schaaff has cautioned Plaintiff that prisoners who make complaints are sent to "diesel therapy" or to maximum security penitentiaries. (Compl. at ¶ 63.) Plaintiff has nonetheless continued to file administrative complaints but alleges that his complaints are met with reluctance and sarcasm and that officers lie to the Warden to make it seem like Plaintiff is

---

[2] According to Defendants, Plaintiff's adverse reaction was not caused by Haldol but rather by Plaintiff's ingestion of peanut butter, a substance to which Plaintiff allegedly reported a long-standing allergy.

5

getting good health care.

As a result of Plaintiff's growing unpopularity at Fort Dix, he alleges that he is becoming the target of malicious rumors and frame-ups. For example, Physician's Assistant Gibbs allegedly fabricated and circulated a rumor that Plaintiff was sleeping with one of the female guards. On a subsequent occasion, Gibbs allegedly refused to distribute pain medication to Plaintiff when Plaintiff arrived at the "Pill Line" near closing time. According to Plaintiff, Gibbs used the fact that Plaintiff came to the Pill Line so near to closing time as an excuse to goad Plaintiff into an altercation for which Gibbs could put him in the SHU. In addition to refusing to distribute medication to Plaintiff, Gibbs filed an incident report accusing Plaintiff of screaming obscenities, kicking the door to the pill distribution building, and throwing books in Gibbs's direction, which Plaintiff insists is patently false.

Plaintiff filed a Complaint on October 30, 2008 against Defendants sounding in four counts and requesting injunctive relief and damages. Count One alleges negligence and Constitutional violations relating to Defendants' inadequate medical care of Plaintiff's hernia. Count Two alleges fraud, misrepresentation, malpractice, and civil conspiracy related to Plaintiff's psychological treatment. Count Three alleges unconstitutional retaliation for filing administrative grievances. Count Four appears to allege a violation of 18 U.S.C. § 1001 for falsifying a federal document.

On April 21, 2009, Defendants filed a motion to dismiss Plaintiff's Complaint, or in the alternative, for summary judgment. Plaintiff has not filed a brief in opposition.

**II.   STANDARD**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint or portions of a

complaint may be dismissed for failure to state a claim on which relief can be granted. FED. R. CIV. P. 12(b)(6). In reviewing a motion to dismiss under Rule 12(b)(6), the Court must first separate the factual and legal elements of a claim, accepting the well-pleaded facts as true, but disregarding any legal conclusions. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Ashcroft v. Iqbal, __ U.S. __, 129 S.Ct. 1937, 1949 (2009)). Second, the court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" Id. at 211 (quoting Iqbal, 129 S.Ct. at 1950). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" Iqbal, 129 S.Ct. at 1950 (quoting FED. R. CIV. P. 8(a)(2)).

On the other hand, summary judgment is appropriate where the court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the non-moving party." Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 248 (1986). When the Court weighs the evidence presented by the parties, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (quoting Celotex, 477 U.S. at 331 (Brennan, J., dissenting)). The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim;

or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. Id. at 331.

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Corliss v. Varner, 2007 WL 2709661, at *1 (3d Cir. Sept. 17, 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2003)).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the factfinder, not the district court. BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

**III.   DISCUSSION**

Defendants argue that Plaintiff's claims stemming from the diagnosis and treatment of his hernia leading up to surgery should be dismissed for failure to state injury of a constitutional magnitude and because the Inmate Accident Compensation Act, 18 U.S.C. § 4126 ("IACA")

precludes a recovery in tort. Defendants further argue that Plaintiff's remaining claims regarding improper post-surgery follow-up care, improper care for a psychological condition, staff retaliation, and falsified incident reports should be dismissed for failure to exhaust administrative remedies.

### A.      Plaintiff's Hernia Diagnosis and Treatment

#### 1.      Plaintiff's Bivens Claim

The Court agrees with Defendants that Plaintiff has not articulated an injury rising to the level of a constitutional violation with respect to Defendants' diagnosis and treatment of his hernia.

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. Estelle v. Gamble, 429 U.S. 97, 103-04 (1976). In order to show a violation of his right to adequate medical care, an inmate must prove: (1) a serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need. Id. at 106.

The first prong of Estelle is an objective one. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" Hudson v. McMillian, 503 U.S. 1, 9 (1992). Serious medical needs include those that have been diagnosed by a physician as requiring treatment or that are so obvious that a lay person would recognize the necessity for doctors' attention, and those conditions which, if untreated, would result in lifelong handicap or permanent loss. See Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).

The second prong of Estelle is a subjective one. Deliberate indifference is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk or harm. See Farmer v. Brennan, 511 U.S. 825, 836, 837-38 (1994). Moreover, a prisoner's subjective dissatisfaction with his medical care does not, without more, indicate deliberate indifference. See Andrews v. Camden County, 95 F. Supp. 2d 217, 228 (D.N.J. 2000) (citing Peterson v. Davis, 551 F. Supp. 137, 145 (D. Md. 1982), aff'd, 729 F.2d 1453 (4th Cir. 1984)). Similarly, "mere disagreements over medical judgments do not state Eighth Amendment claims." White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990). "Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment. Implicit in this deference to prison medical authorities is the assumption that such informed judgment has, in fact, been made." Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotation and citation omitted). Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an Eighth Amendment violation. See Estelle, 429 U.S. at 105-06.

"Where prison authorities deny reasonable requests for medical treatment, however, and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury,' deliberate indifference is manifest. Similarly, where 'knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care,' the deliberate indifference standard has been met." Monmouth County Corr. Inst. Inmates, 834 F.2d at 346 (citations omitted).

Applying these principles to the instant mater, it is clear that Plaintiff's allegations with

respect to his hernia diagnosis and treatment do not state a claim for an Eighth Amendment violation. Plaintiff does not allege that he was ever denied evaluation for his complaints of pain. In fact, Plaintiff alleges that he was evaluated by Health Services several times and was correctly diagnosed with a hernia shortly after his initial complaint. Immediately after his diagnosis, Plaintiff was scheduled for a surgical consultation. He received the surgical consultation, was scheduled for surgery, and had the surgery performed. After his surgery, Plaintiff alleges that he was provided with wound cleaning materials and pain medication. When Plaintiff's wound subsequently became infected, he was scheduled for, and received, emergency surgical intervention. Although Plaintiff is clearly dissatisfied with the level of care that he has received, his allegations with respect to his hernia diagnosis and treatment rise, at most, to the level of negligence, not constitutional tort.[3] See Foreman v. Bureau of Prisons, No. 04-5413, 2005 WL 3500807, at *6 (D.N.J. Dec. 20, 2005) ("[D]ecisions by prison medical staff involving the exercise of professional judgment do not violate the Eighth Amendment, even though they may be grounds for professional malpractice.") (citation omitted).

## 2. Plaintiff's Federal Tort Claims Act Claim

The Court also agrees with Defendants that Plaintiff's negligence claims pursuant to the FTCA are precluded by operation of the IACA.

Pursuant to the doctrine of sovereign immunity, the United States may not be sued without its consent. The FTCA, however, provides "a limited waiver of sovereign immunity,

---

[3] The Court notes that it does not reach the issue of whether Plaintiff's claim based on Defendants' alleged failure to provide sterile post-emergency surgery care rises to the level of an Eighth Amendment violation because, as discussed below, Plaintiff has not exhausted his administrative remedies with respect to this claim.

making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." United States v. Orleans, 425 U.S. 807, 813 (1976)).

In an unpublished opinion, the Third Circuit has agreed with the uniform consensus amongst the Courts of Appeal that "[f]ederal prisoners seeking compensation for injuries sustained during penal employment are limited to the remedy provided by [the IACA]." Cooleen v. Lamanna, 248 Fed. Appx. 357, 362 (3d Cir. 2007) (per curiam). The preclusive effect of the IACA extends to prisoners' claims for injuries arising from subsequent medical negligence related to treatment of the initial work-place injury. Id.

In this case, Plaintiff sustained his hernia while at work. Thus, Plaintiff's allegations of injury sustained from the time of his initial visit to Health Services through, at the least, his first hernia surgery, clearly arise from medical negligence subsequent to an initial work-place injury. Accordingly, Plaintiff's sole remedy for these claims is through the IACA, not the instant suit.[4]

**B.  Plaintiff's Remaining Claims**

Defendants argue that the remainder of Plaintiff's claims should be dismissed for failure to exhaust administrative remedies.

At the outset, the Court notes that Defendants' motion to dismiss for failure to exhaust administrative remedies is technically improper. Failure to exhaust is considered an affirmative defense and thus Plaintiff bears no burden of pleading exhaustion. Jones v. Bock, 549 U.S. 199,

---

[4] Again, the Court expresses no opinion as to whether Plaintiff's claims of injury arising from Defendants' alleged failure to provide sanitary post-emergency surgery follow-up care is similarly barred by the IACA because Plaintiff has not exhausted his administrative remedy with respect to this claim.

216 (2007).  However, because a district court may treat a motion to dismiss as one for summary judgment where all parties are given a reasonable opportunity to present pertinent material, FED. R. CIV. P. 12(d), and because a motion to dismiss couched in the alternative as a motion for summary judgment provides sufficient notice of potential conversion, Brandon v. Warden, N. State Prison, No. 05-3031, 2006 WL 1128721, at *3 (D.N.J. Apr. 27, 2006), the Court shall consider whether summary judgment is appropriate with respect to Plaintiff's remaining claims. Moreover, because Defendants' motion for summary judgment is unopposed, the Court will treat all facts properly supported by Defendants as uncontroverted.  See id. (citations omitted).  The Court will not, however, grant summary judgment on the basis of Plaintiffs' silence alone, but will instead "determine whether summary judgment is appropriate – that is, whether the moving party has shown itself to be entitled to judgment as a matter of law."  Anchorage Assocs. v. V.I. Bd. of Tax Rev., 922 F.2d 168, 175 (3d Cir. 1990).

Under the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e ("PLRA"), prisoners may not contest prison conditions under 42 U.S.C. § 1983 or any other Federal law in federal court until exhausting "all avenues of relief available to them within their prison's inmate grievance system."  Spruill v. Gillis, 372 F.3d 218, 227 (3d Cir. 2004).  The exhaustion requirement clearly applies to Bivens claims.  Hughes v. Knieblher, 09-2177, 2009 WL 2219233, at *1 (3d Cir. July 27, 2009) (per curiam) (citing Nyhuis v. Reno, 204 F.3d 65, 69 (3d cir. 2000)).  The exhaustion requirement mandates that a plaintiff must pursue to completion all available administrative remedies, even if they are not "plain, speedy, and effective," or do "not meet federal standards," or could not result in the relief requested in the suit.  Porter v. Nussle, 534 U.S. 516, 524 (2002).  Moreover, the prisoner must "carry the grievance through any available

appeals process" before the remedies will be deemed exhausted. Camino v. Scott, No. 05-4201, 2006 WL 1644707, at *4 (D.N.J. June 7, 2006) (citing Nyhuis, 204 F.3d at 67).

To exhaust a claim, federal prisoners must comply with the Bureau of Prison's administrative remedy procedure outlined at 28 C.F.R. § 542.10, et seq. To initiate the process, an inmate is generally required to attempt to informally resolve the issue with prison staff. 28 C.F.R. § 542.13. If informal resolution is ineffective, the inmate is required to file a formal complaint with the Warden, 28 C.F.R. § 542.14, and appeal unfavorable decisions through the regional director to the Office of General Counsel, which is the final administrative appeal available. 28 C.F.R. § 542.15

In support of its contention that Plaintiff has not exhausted his administrative remedies, Defendants offer the declaration of Tara Moran, a legal assistant at Fort Dix responsible for coordinating all remedy requests and appeals from Fort Dix inmates.[5] Based upon a review of the relevant computerized indexes, Ms. Moran declares that Plaintiff has fully exhausted his administrative remedies with respect to his request for hernia surgery, but that Plaintiff has failed to file administrative remedy requests for improper follow-up care, improper psychological treatment, staff retaliation, or falsified incident reports. As Plaintiff has not come forward with any evidence in rebuttal, the Court concludes that Plaintiff has failed to exhaust his administrative remedies for his claims set out in Counts Two, Three, and Four and so much of Count One as alleges liability based on post-surgery, follow-up medical care. Accordingly, summary judgment is appropriate as to these claims.

---

[5] Although not sworn, Ms. Moran's declaration is appropriately considered at the summary judgment stage because it conforms to the requirements of 28 U.S.C. § 1746. See Bond v. Taylor, No. 07-6128, 2009 WL 2634627, at *2 (D.N.J. Aug. 24, 2009).

**IV.    CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss, or in the alternative, for summary judgment will be granted and the case dismissed.  An accompanying Order shall issue today.


Dated: 11-09-2009                                                      /s/ Robert B. Kugler
                                                                                  ROBERT B. KUGLER
                                                                                  United States District Judge